**STATE of Iowa, Appellee,**

v.

**Clarence Adrian YEO, Jr., Appellant.**

No. 01–1653.

Supreme Court of Iowa.

April 2, 2003.

Brian L. Earley of Earley Law Office, Montezuma, for appellant.

Thomas J. Miller, Attorney General, Bridget A. Chambers and Scott Brown, Assistant Attorneys General, and Charles A. Stream, County Attorney, for appellee.

CADY, Justice.

In this appeal, we consider a challenge to the sufficiency of the evidence underlying the defendant's conviction for child endangerment, particularly with respect to accomplice testimony he asserts was insufficiently corroborated. The defendant also challenges the district court's finding of

four separate acts of child endangerment and argues that he was found guilty under a theory not described in his indictment. For the reasons that follow, we affirm the judgment and sentence of the district court.

## I. Background Facts and Proceedings.

Frank Charbonneau, Jr. (Frankie), was born on September 14, 1998. From the time of his birth until March 7, 2000, Frankie lived with his parents, Miranda and Frank Charbonneau, Sr. On March 7, Frankie's parents chose to separate and Frank moved from the marital home. The same day, Miranda's boyfriend—Frank's half brother—Clarence A. Yeo, Jr., moved in with Miranda and Frankie.

Within a month after Clarence arrived in the home, Frankie's father and paternal grandmother reported suspicious bruises on Frankie to the Iowa Department of Human Services (DHS) and expressed concerns that he was being abused. In response to their report, the DHS contacted a local doctor who examined Frankie on April 10. The doctor observed three small bruises on Frankie's forehead. She opined the bruises indicated his head recently had been "palmed" like a basketball. After the examination, Frankie went to live with his father and grandmother for a short time. Unfortunately, Frank was unable to care for his son in the long term, and the child was soon returned to his mother and her boyfriend.

Frankie was subjected to several episodes of abuse over the next six weeks.[1]

1. The description of these episodes was based largely on the testimony of Miranda, who testified against Clarence at trial on behalf of the State. Miranda was also charged with committing multiple acts of child endangerment against Frankie, but later pled guilty to

a charge of child endangerment causing serious injury in violation of Iowa Code section 726.6(1)(e) (1999) ("[k]nowingly permit[ting] the continuing physical or sexual abuse of a child"). Her plea was the product of an agreement whereby she avoided trial for mul-

On one occasion in mid-August, Clarence grew angry with Frankie while trying to feed him. He then picked Frankie up by the head, and threw the child across the room into a wall. Frankie slid down the wall, hit his head on a living room couch, and began to cry. When he stood-up and walked away, he walked with a noticeable limp. Near the end of August, Clarence lifted Frankie up by grabbing him around the chest and slammed his "bottom" onto the floor. This incident rendered Frankie unable to sit comfortably for a period of time. Yet, these injuries were only a prelude to September 3, when his abuse reached a watershed. On that day, Clarence and Miranda decided to run some errands. They brought Frankie with them even though he was ill. While the three drove through town, Frankie vomited in the car. Clarence told Miranda to stop the car. He then snatched Frankie from his soiled car seat, and forcefully sat him down on the trunk of the car. Although Miranda reacted angrily to this act, the threesome eventually returned to the car and drove to a local Casey's General Store so that Frankie could be cleaned up.

As they headed toward the local Casey's, tempers flared between Clarence and Miranda. Frankie was now in the front seat of the car, having been placed between the couple at some point. While the car was stopped at a stop sign, Miranda jerked Frankie toward her, only to have Clarence take him right back. Miranda angrily exited the car and walked away from her son and boyfriend. She eventually returned to the car, and the group continued to the Casey's.

After arriving at the Casey's, the group went to the restroom to clean up Frankie. When Frankie began to cry during the cleaning process, Clarence slammed the child's head into a toilet. This act made Miranda "hysterical" and caused her to flee the restroom. Clarence later emerged with Frankie. The threesome left the Casey's and went home.

Once home, Clarence and Miranda put Frankie on a living room couch. Clarence claimed Frankie was alone on the couch when they both heard a thud. Clarence went to check on Frankie and found he had rolled off of the couch and was limp, barely breathing, and his eyes were rolled back in his head. Miranda gave Frankie CPR, and the couple brought him to Mahaska County Hospital. He was later transported to Blank Children's Hospital in Des Moines where he was admitted in critical condition.[2]

When initially questioned about Frankie's injuries by medical personnel, Miranda claimed that Frankie had been playing in the house and fell, hitting his head. Clarence did not dispute this account. Later, Clarence told investigators that Frankie had been injured when he fell off the couch while sleeping. Neither story was consistent with Frankie's injuries: a serious closed head injury caused by non-accidental shaking, a healing fracture of the foot, a healing compression fracture of the spine, and a number of bruises of varying age, location, and severity.

tiple acts of endangerment in exchange for her testimony against Clarence. Miranda was sentenced to a term of incarceration not to exceed ten years for her role in Frankie's abuse.

**2.** Frankie remained in the hospital for ten weeks—part of the time sustained by a respi-

rator—and went to live with his maternal grandparents after he was released. He has since undergone speech, physical, and occupational therapies to overcome the physical and mental disabilities that arose in the aftermath of his injuries.

Clarence was later charged with committing multiple acts of child endangerment against Frankie in violation of Iowa Code sections 726.6(1), 726.6(2), and 726.6A (1999). His first trial resulted in a conviction, but he was granted a new trial due to the trial court's failure to include a jury instruction pertaining to the accomplice testimony of Miranda. Clarence consented to a bench trial following his successful motion for a new trial.

On retrial, Clarence argued he had not caused Frankie's injuries, including the closed head injury. He claimed the head injury was caused when Frankie struck his head on September 3 after Miranda jerked him from his seat in the car. The district court rejected Clarence's defense and, although noting evidence of additional incidences of abuse, found that he committed four separate acts of child endangerment to Frankie resulting in (1) bruises and abrasions when Frankie was "palmed" sometime "during the first few days of April 2000," (2) a broken bone in Frankie's foot when Clarence threw him against a wall "near the middle of August, approximately three weeks before September 3rd," (3) an injury when Clarence grabbed Frankie and forcefully sat him down on the trunk of the car on September 3, and (4) injuries when Clarence slammed Frankie's head into the toilet at Casey's on September 3.

Based on these findings, Clarence was found guilty of committing three or more separate acts of child endangerment, one of which involved a skeletal injury, in violation of Iowa Code sections 726.6(1) and 726.6A. In its conclusions of law, the district court noted that the evidence in the case supported a finding that Clarence violated subsections (*a*) and (*b*) of section 726.6(1) in particular. Under those subsections, child endangerment occurs when

a "person having custody or control over a child[:]"

> *a.* Knowingly acts in a manner that creates a substantial risk to a child['s] ... physical, mental or emotional health or safety[; or]
>
> *b.* [Intentionally] ... uses unreasonable force, torture or cruelty that results in physical injury, or that is intended to cause serious injury.

Iowa Code § 726.6(1)(*a*), (*b*). The district court also concluded that Clarence violated Iowa Code section 726.6A by engaging

> in a course of conduct including three or more acts of child endangerment ... within a period of twelve months involving the same child ... where one or more of the acts ... result[ed] in a skeletal injury to a child under the age of four years....

*Id.* § 726.6A. Clarence was sentenced to a term of imprisonment not to exceed fifty years. *See id.* He appeals from the district court's judgment and sentence.

## II. Standard of Review.

Each of Clarence's challenges on appeal focuses on the sufficiency of the evidence underlying his judgment and sentence. Our review of challenges to the sufficiency of the evidence is for correction of errors at law. *State v. Lambert,* 612 N.W.2d 810, 813 (Iowa 2000) (citing *State v. Thomas,* 561 N.W.2d 37, 39 (Iowa 1997)). We are bound by the trial court's finding of guilt if it is supported by substantial evidence upon which "a rational trier of fact could conceivably find the defendant guilty beyond a reasonable doubt." *Id.* To determine whether the evidence was substantial, we consider the entirety of the evidence presented in a "light most favorable to the State, including all legitimate inferences and presumptions which may be fairly and reasonably deduced from the record." *Id.* Evidence is

not substantial if it raises only suspicion, speculation, or conjecture. *Id.*

### III. Corroboration of Miranda's Testimony.

■ The district court concluded that Miranda was Clarence's accomplice and, therefore, pursuant to Iowa Rule of Criminal Procedure 2.21(3), her testimony describing the time, place, and details of Frankie's abuse required corroboration if it was to support the court's conclusion that Clarence was responsible for three or more separate acts of child endangerment. Iowa Rule of Criminal Procedure 2.21(3) provides:

> A conviction cannot be had upon the testimony of an accomplice or a solicited person, unless corroborated by other evidence which shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.

Corroborating evidence, which may be direct or circumstantial, "'need not be strong and need not be entirely inconsistent with innocence.'" *State v. Bugely*, 562 N.W.2d 173, 176 (Iowa 1997) (quoting *State v. Dickerson*, 313 N.W.2d 526, 529 (Iowa 1981)). The evidence is sufficient as long as it "support[s] some material part of the accomplice's testimony and tend[s] to connect the accused to the commission of the crime." *Id.*

■ The district court found Miranda's testimony was corroborated by the testimony of Frank Charbonneau, Sr., Dr. Ron-

da Dennis–Smithhart, Linda and Heather Horn, Dr. Michael Rubin, and Dr. Karen Gerdes. The bulk of Frank's testimony focused on the period of time during which Frankie lived with his father and grandmother, and included testimony about the injuries that led to the investigation by the DHS in April 2000. Dr. Dennis–Smithhart examined Frankie on April 10 after the abuse concerns were raised, and testified to her findings during that examination. Linda and Heather Horn witnessed the incident when Clarence set Frankie down forcefully on the trunk on September 3 and testified about that event, particularly the force applied by Clarence. Finally, Dr. Gerdes and Dr. Rubin, who had both provided care to Frankie in the aftermath of September 3, testified to the nature and cause of the injuries inflicted that day. Both physicians concluded Frankie suffered from shaken baby syndrome.[3]

Clarence challenges the sufficiency of this evidence, asserting Miranda's testimony was insufficiently corroborated. He first argues that the testimony relating to Frankie's injuries established only that Frankie was injured and did not further corroborate Miranda's account of how the injuries were caused. He also claims that Miranda's testimony was inherently flawed because it came after the corroborating witnesses' depositions were taken thus allowing Miranda to simply "parrot" the others' testimony. However, after examining the record as a whole, we believe the district court properly determined Miranda's testimony relating to the four separate

---

**3.** Shaken baby syndrome (SBS) is "a condition of whiplash-type injuries ranging from bruises on the arms and trunk to retinal hemorrhages, coma, or convulsions, as observed in infants and children who have been violently shaken." *Mosby's Med., Nursing & Allied Health Dictionary* 1485 (5th ed.1998). Some cases involving severe brain damage can result from "blunt impact trauma to the skull" as well as shaking, "and the term 'shaken-impact syndrome' has been suggested as a more accurate description of the event." Roger Cicala, *Shaken Baby Syndrome, in Attorneys' Textbook of Medicine* 128–1, 128–2 (Roscoe N. Gray & Louise J. Gordy eds., 2001).

incidences of abuse was sufficiently corroborated.

The evidence indicated that each of Frankie's injuries occurred only after Clarence moved in with Miranda. In fact, there was no evidence that Frankie suffered abnormal injuries at any time other than when he resided in the same household as his mother's boyfriend. *See State v. Doss*, 355 N.W.2d 874, 880 (Iowa 1984) (affirming the district court's finding that limited testimonial evidence of defendant's presence at planning and execution of murder plot was corroborating). Frankie was injury-free before Clarence moved in in March 2000 and between mid-April and late July when he lived with his father and grandmother. Thus, there was evidence of a direct correlation between Frankie's injuries and Clarence's regular presence in his life.

Moreover, the impact of Clarence's presence was further borne out by the testimony of witnesses who corroborated Miranda's testimony relating to the timing and extent of Frankie's abuse, particularly the occasions when he was bruised and his foot was broken. In the case of the bruises, Dr. Dennis–Smithhart testified to a reasonable degree of medical certainty that Frankie had been bruised as a result of being "palmed" by the head, a conclusion which was consistent with Miranda's testimony that Clarence had at one point picked Frankie up by the head and slammed him into a chair. Both Dr. Gerdes and Dr. Rubin testified to the reaction a child would have as a result of breaking a bone in his foot. This testimony corroborated Miranda's description of Frankie's reaction—crying and limping away—after falling to the floor after being thrown against a wall by Clarence in mid-August.

The events of September 3 were likewise corroborated. The first stage of Clarence's abuse of Frankie that day was actually witnessed by Linda and Heather Horn who later testified about Clarence setting Frankie down forcefully on the trunk of the car. Dr. Gerdes and Dr. Rubin corroborated Miranda's testimony about the second stage of the September 3 abuse. Both testified that Frankie suffered from shaken baby syndrome, a specialized diagnosis that indicated not only that Frankie was injured, but also that he was injured in an especially traumatic way that deviated from the initial explanations that Frankie had merely hit his head while playing or falling off the couch.[4] Although Clarence later argued at trial that Frankie struck his head after being jerked from his seat in the car by his mother, Dr. Rubin testified, even if Frankie had struck his head, such an incident would not cause the injuries Frankie suffered.[5] Thus, Dr.

4. Dr. Gerdes elaborated her conclusions regarding the incongruity between the severity of Frankie's injuries and the claimed causation in her testimony:

A: Falls from less than 3 feet, which is about the height of a couch, especially onto carpeted floor, do not result in the type of brain injury that Frankie had. The literature currently states that it needs to be a fall usually greater than 8 feet on to some type of hard surface or a significant motor vehicle crash or another type of injury that involves significant shaking with some type of deceleration/acceleration injury to cause that type of brain injury.

Q: Whenever you talk about acceleration/deceleration, what do you mean by that? A: Something that moves very quickly forward and backwards.

Q: And what's moving quickly forward and backwards? A: The child's head....

5. The evidence related to Frankie possibly striking his head after being jerked from his seat in the car by Miranda came through the testimony of the Longs, a married couple who had been driving by Clarence and Miranda's car when it was stopped at a stop sign on September 3. Bryan Long testified that he was "sure" that Frankie had struck the right

Gerdes' and Dr. Rubin's findings corroborated Miranda's claim that Frankie's most horrific injuries were tied directly to Clarence slamming Frankie's head into the toilet at Casey's.

Ultimately, Miranda's testimony about each of the four abuse events the district court determined Clarence caused was sufficiently corroborated. Clarence's argument to the contrary fails in the face of the substantial evidence of his cruelty and its effect on Frankie.

## IV. Three Separate Acts.

In *State v. Hickman*, 576 N.W.2d 364, 368 (Iowa 1998), we found substantial evidence to support a conviction for child endangerment, but reversed the conviction under the enhanced punishment provisions of section 726.6A. In determining the evidence was too vague to support a finding of three separate acts of endangerment, we stated that the three or more acts required under section 726.6A "should be established with enough precision to enable a jury to be satisfied beyond a reasonable doubt of a time and place where each of the three acts occurred." *Id.* Clarence seizes on the "time and place" language of *Hickman* and argues a similar failure occurred in this case. He asserts that the State failed to establish the time and place of the four separate incidents of abuse of Frankie beyond a reasonable doubt as required by *Hickman*.

Our "time and place" requirement in *Hickman* was prompted by the lack of evidence in the record separating one particular act of abuse from other acts of abuse. A finding of "a time and place where each of the three acts occurred" was not supported by the evidence. *Id.* Thus, the rule we established was that the three or more separate acts must be shown with reasonable specificity to enable a jury to be satisfied beyond a reasonable doubt of a time and place where each act occurred. However, this rule does not mean that evidence of the *precise* time and place of each incident or act is required, but merely means the three or more acts must be separated by time and place so that each incident is separate and distinct.

This approach is consistent with the language of the statute, as well as our general rule that the State is not required to prove the precise time and place of a crime. *See State v. Griffin*, 386 N.W.2d 529, 532 (Iowa App. 1986); *State v. Washington*, 356 N.W.2d 192, 196 (Iowa 1984). It is also compatible with the very nature of child abuse, and the inherent difficulty of establishing precise times and places of abuse to children due to the frequent delay in the discovery of the abuse, as well as other factors based on the nature of the crime.

side of his head on the driver's side door when Miranda pulled him out of his seat. Jolene Long stated that she had not seen any part of Frankie's body strike the car, "but it very easily could have hit."

Dr. Gerdes later testified that the only bruising detected on Frankie's head on September 3 was above his left eyebrow. This testimony seemingly contradicted Bryan Long's explanation that the right side of Frankie's head had struck the driver's side door. However, the testimony of Dr. Rubin further undermined an alternative conclusion that Miranda's jerking of her son had caused his most serious injuries:

Q: Okay. For purposes of the next question, I want you just to assume the following fact; okay? Let's assume that you have two people sitting in a stationary car, you have a driver and you have a passenger, both adults. They have a 23–month–old normal-sized child, and he's in the lap of the passenger. The driver pulls the child across the seat, and in so doing that, the child hits his head on the steering wheel or possibly hits his head on the driver's side door, just one time, bumped his head or hits his head. Would you expect to see the type of injuries that you saw in Frankie Jr.?
A: No.

*See Griffin,* 386 N.W.2d at 532; *see also People v. Jones,* 51 Cal.3d 34, 270 Cal. Rptr. 611, 792 P.2d 643, 659 (Cal.1990); *Pace v. United States,* 705 A.2d 673, 677 (D.C.1998). We do not think our legislature intended to impose the strict requirement urged by Clarence. In this case, there is substantial evidence of "a time and place where each of the [four] acts occurred" even if the time the injuries were inflicted cannot be pinpointed to the precise hour, or even the precise day. *Hickman,* 576 N.W.2d at 368. This is all the *Hickman* rule requires.

Miranda's testimony, corroborated by the testimony of Frank, as well as Linda and Heather Horn, established that Clarence was present when Frankie was abused. Moreover, Linda and Heather Horn actually witnessed one of the abuse incidents, when Clarence forcefully sat Frankie down on the trunk of the car on September 3. Additional testimony by Frankie's medical providers established the timing of the other abuse. Dr. Dennis–Smithhart described the bruises that were caused by Frankie's head being palmed and established a limited range of time—"four to seven or eight days" before the April 10 examination—in which they were inflicted. Dr. Rubin testified to the nature of the fracture in Frankie's foot, establishing that the injury also occurred within a limited timeframe, likely "3 to 5 or 3 to 6 weeks" prior to Dr. Rubin's examination. Finally, both Dr. Gerdes and Dr. Rubin testified that Frankie's injuries in the immediate aftermath of being slammed into the toilet supported a finding that his injuries occurred on September 3.

This accumulated testimony—which was far more specific than that presented in *Hickman*—established with reasonable specificity and precision the separate times and places of Frankie's injuries. Our standard requires these elements to be estab-

lished beyond a reasonable doubt, and this was done in this case.

## V. The Finding of Guilt.

■ Clarence's final challenge focuses on the nature of the district court's conclusion that he was guilty of child endangerment. He argues that he was ultimately found guilty of child endangerment causing skeletal injury rather than child endangerment causing serious injury, the charge stated in the trial information filed in his case. *See* Iowa Code § 726.6A. The difference in these charges, although semantically minor, signals major differences in the injury inflicted and the defense that must be mounted on behalf of a defendant charged under either of the theories.

Recognizing the inherent injustice of forcing a defendant to defend against a crime with which he has not been charged, we have observed, "[w]hen a crime may be committed in different ways, and the State specifies one way, the offense must be proved to have been committed in the way charged." *State v. Willet,* 305 N.W.2d 454, 457 (Iowa 1981); *see also State v. Pexa,* 574 N.W.2d 344, 347 (Iowa 1998); *State v. Grice,* 515 N.W.2d 20, 22–23 (Iowa 1994); *State v. Kirby,* 391 N.W.2d 243, 244–45 (Iowa 1986). Accordingly, if "there is a variance between the crime charged and the proof at trial, we will require a new trial if a substantial right of the defendant is prejudiced." *Willet,* 305 N.W.2d at 457. However, "[a] variance between the information and the proof is prejudicial" only "if the defendant is not fairly notified of the charges against him so that he may prepare to defend." *Id.*

The State concedes that Clarence was found guilty under the skeletal injury alternative instead of the serious bodily injury alternative under which he was charged in the trial information. However, the State responds to Clarence's claim the var-

iance was prejudicial by first arguing that he failed to preserve this issue for review. In the alternative, the State argues that the variance between charge and conviction simply was not prejudicial because Clarence had notice that the State was proceeding with both endangerment alternatives and ultimately defended against both alternatives.

The State points to Clarence's prior trial in this case, arguing the charges he faced at that stage of the case warned him that the skeletal injury would again be a consideration in the new trial. The minutes of testimony included with the trial information also may have notified Clarence that Frankie's skeletal injury would be an issue in the new trial, especially because it would likely be a key part of Frankie's medical providers' testimony. *See Grice*, 515 N.W.2d at 23; *Kirby*, 391 N.W.2d at 245. Yet, no matter how Clarence was notified that the skeletal injury alternative was at issue, an examination of the record reveals that the State produced substantial evidence supporting the skeletal injury alternative, and more importantly, Clarence anticipated and defended against the alternative at nearly every stage of his trial.

Moreover, despite his protestations on appeal that the alternative was not charged, Clarence failed to challenge the trial information at any point during his trial while otherwise defending against the alternative. Given the State's presentation of substantial evidence supporting the alternative and Clarence's defense against the charge, we can only conclude that Clarence had notice that the alternative was in play. If he hoped to avoid its consideration by the district court a timely objection to the trial information during trial would have been appropriate. Even assuming that this challenge was properly preserved—and we note several deficiencies in its preservation, including the ab-

sence of such an objection—Clarence's argument on this issue is repudiated by an examination of the record. Clarence cannot now claim his trial was corrupted by a faulty trial information given he defended against the alternative and otherwise suffered no prejudice from the flawed information.

## VI.  Conclusion.

Despite Clarence's arguments that his judgment and sentence were not supported by sufficient evidence, we conclude that the district court's findings were sufficiently supported. We affirm the judgment and sentence of the district court.

**AFFIRMED.**