# IN THE COURT OF APPEALS OF IOWA

No. 22-0827
Filed May 24, 2023

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**MATTHEW JAMES DAVIS,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Webster County, Thomas J. Bice,

Judge.


        Matthew Davis appeals his convictions and the sentences imposed for two

counts of third-degree sexual abuse and two counts of incest.  **AFFIRMED.**



        Martha J. Lucey, State Appellate Defender, and Shellie L. Knipfer, Assistant

Appellate Defender, for appellant.

        Brenna Bird, Attorney General, and Zachary Miller, Assistant Attorney

General, for appellee.


        Considered by Bower, C.J., and Tabor and Greer, JJ.

**BOWER, Chief Judge.**

Matthew Davis appeals his convictions and the sentences imposed for two counts of third-degree sexual abuse and two counts of incest.[1]  He contends the trial court abused its discretion in overruling his objection to allowing his wife, Patti, to testify about having been sexually abused as a child.  He maintains the verdicts are not supported by sufficient evidence and are contrary to the weight of the evidence.  Davis also asserts the court abused its discretion in imposing consecutive sentences.  We affirm.

**I. Background Facts and proceedings.**

At trial, the jury heard the audio recording of a September 27, 2021 interview with Davis by Larry Hedlund at Davis's workplace.[2]  Hedlund summarized the interview, noting Davis "made admissions to having oral sex with his daughter [L.] He made admissions to having his fingers inside of his daughter [L.'s] vagina.  He made partial admissions to sexual intercourse with his daughter [L.]"  Hedlund testified Davis was arrested after that interview.

L. testified at trial that she moved in with her father and Patti the summer of 2019, before her freshman year of high school started.  Prior to moving, L. had lived with her mother, Heather, in a different town, and her relationship with Davis

---

[1] Of the ten counts on which Davis was tried, the court dismissed two before the jury deliberated.  Of the remaining charges, the jury found him guilty of count III ("During the months of May through September 2020, said Defendant did commit Sexual Abuse in the Third Degree against [L.], by force or against her will . . . ."), count IV ("During the months of May through September 2020, said Defendant committed incest against [L.], a related individual . . . ."), count V ("On or about September 23, 2021, said Defendant did commit Sexual Abuse in the Third Degree against [L.], by force or against her will . . . ."), and count VI ("On or about September 23, 2021, said Defendant committed incest against [L.] . . . .").
[2] Hedlund was an investigator with the county attorney's office.

was a "typical father-daughter relationship." But that changed a couple months after she moved in with Davis. L. testified Davis began telling her about sexual terms "to help you and make you learn about it." He showed her pornography and later began engaging in sex acts with her. The prosecutor and L. had this exchange:

> Q. Can you tell me where [Davis's] penis has been in your body? A. My mouth, my vagina, and my butt.
> Q. Okay. Has your mouth ever been anywhere on his body? A. Yes.
> Q. Can you tell me about that? A. His penis.
> Q. Okay. Has his mouth ever been anywhere else on your body? A. Yes.
> Q. Can you tell me about that? A. All over. . . . My mouth, my boobs, my vagina.
> Q. So he's had his mouth on your vagina? A. Yes.
> Q. Has he ever digitally penetrated you? A. Yes.
> Q. And by that, I mean your fingers? A. Yes.
> Q. Where did he put his fingers? A. In my vagina.
> Q. Anywhere else? A. No.

When asked how many times this occurred, she responded, "Probably about a hundred." After additional questioning, L. testified she could not remember precise dates "because it happened so much that they all blur together," but she was "positive" it started her freshman year of high school.

L. testified the first time Davis moved beyond showing her pornography was at the end of her freshman year—she was fourteen. She testified Davis followed her into the basement where she was doing laundry. He grabbed a blanket and undressed. When L. tried to go upstairs, Davis blocked her. He then kissed her, got her on the floor, took her pants off, and placed his finger in her vagina. He stopped when he heard noise upstairs and told L. that if she told Patti or called the police, "he would make sure [her] life was hell."

L., who was involved in a number of sports, testified Davis started to join in her at-home workouts, but "his workouts were different than workouts. . . . Workouts are sit-ups and push-ups.  To him, workouts meant a code word for let me do anything I want to."  She testified these "workouts" occurred in the living room after other family members went to bed:

> A. He would do a couple of sit-ups and push-ups and then he would move closer to me when I was doing mine, and then just start touching and be, like, I'll just give you some rubs or massages.  And then that's when he would do things.
> Q. What things would he do, [L.]  A. Rub his fingers through my vagina and then just go from there.
> Q. Okay.  I'm going to ask you to explain "go from there." A. Put his fingers inside me, and then he would try to take my pants off.  And then he would kiss my breasts and then go inside of me more.
> Q. What would he use to go inside you?  A. His fingers or his penis.

When L. would resist and tell him his conduct was inappropriate, he would say, "It's benefitting you, and [i]t's to help you learn, [i]t's only weird if you make it weird."  She testified Davis engaged in sex acts with her at the residence and at the shop at Davis's business.  L. knew the date Davis had a vasectomy in March 2020 and testified his sexual conduct towards her increased afterwards.  She testified that after his vasectomy, Davis showed her "[a] bunch of toys that looked like penises in different shapes and sizes," selected one, and then inserted it into her vagina.  She testified this happened on two occasions.  When shown a picture of a number of the devices found at the home, she testified Davis had used the "purple one."

On September 23, 2021,[3] L. told Patti that Davis had been sexually abusing her and "I told her that he got inside of me all different ways and touched me inappropriately. And that's all I could get out that I can remember before he came down the stairs." L. remembered that later that night, "We were in the living room and I was watching a show, doing my workout, and then I know something happened because he was on top." She testified it was not just touching. L. could not remember exactly what happened though she stated it was more than just touching. She remembered going to a football game on Friday September 24, getting home late, and going directly to bed. On Saturday, L. went to friend's party, where she recalled Davis showed her a video "in front of a lot of people" of two gorillas having sex. L. testified that on Sunday, September 26, she and Patti had a talk and Patti said she was going to try to stay close. Later that evening, Davis asked L. to give him a massage. Knowing Patti was going to try to catch Davis, L. joined Davis, and ended up underneath him and Patti walked in and interrupted the situation.[4] The following morning, September 27, Davis waylaid L. as she was going to school. L. testified she ended up on the floor with Davis saying, "Let me relieve myself from stress" and started trying to remove her pants. But she was able to get up and leave, while Davis had a "hissy fit." L. went to school and was in class when she was asked to go to the office, where she was met with a child-abuse investigator.

---

[3] L. testified she remembered the day because she had gotten a dog the day before and was cleaning out the kennel when she starting crying. Patti was in the basement with her doing laundry.

[4] The jury acquitted Davis on Counts VII and VIII, which related to events on September 26, 2021.

Patti was called by the defense and testified the first time she heard L. accuse Davis was when they were in the basement on "[t]he Thursday before it was turned in" in September:

> A. Yes. I kept saying, "Now what's really wrong."
> Q. Okay. How many times do you think you said that before she said something different than the dog training? A. I don't even know. I would like to say it was six.
> Q. Okay. Then what did she say? A. I can't tell you, I promised.
> Q. And after that? A. I said, "Promised who." She said, "Dad." And I said, "Well, now you got to tell me, honey."
> Q. So what did she tell you? A. She started crying and said, "He touches me." And I kind of looked at her in disbelief and was like, "He touches everybody." And she said, no, and it was either penis or dick has been in me numerous times.

Patti testified L. was not in agreement with Patti's idea that they needed to leave, L. begged her not to tell anybody because Davis "would take everything away from her. She didn't want people to know. She just wanted it to stop." Patti stated she planned to catch Davis in the act, get it on video, and get him out of the house. Then, "Friday, Saturday, Sunday, Monday is all a blur." She continued, "I know at one point I asked, 'Did anything happen.' I don't know if it was Friday or Monday. And I just remember, 'No, he tried, but I didn't let it,' but I can't tell you whether it was Friday or Monday." Patti testified about walking into her bedroom on Sunday and finding Davis with L. on the bed "between her legs." Patti testified she confronted Davis and he acted as if nothing had happened, and Davis told her to "cuddle with us." Patti also testified she tried to check on Davis and L. as they were working out that evening but L. ran to her and told her Davis could hear her on the stairs.

On cross-examination, the following exchange occurred between the prosecution and Patti:

> Q. So let's talk about you and [L.]'s plan to catch Defendant. Why would you have to catch him? Why did you think you had to catch him? A. Because otherwise, he would be able to justify it and tell me what I saw and tell me what to believe in. I believe it. It—
> Q. Do you have anything in your history that would have made you arrive at that decision? I'm sorry to ask that. A. It's okay.

The defense objected on relevance grounds. The trial court overruled the objection. Patti continued:

> A. So growing up, me and my sister were sexually abused by a neighbor kid. And he got away with it for a long time. And he had stopped touching me when I was, like, [eleven]. Well, I found out when I was [thirteen], that he didn't stop with my sister.
> DEFENSE COUNSEL: Your Honor, I would renew my objection. It's also unduly prejudicial. It's not impeachment. It is—I believe the State's question is going to the state of mind of the witness at the time.
> THE COURT: Your objection is noted. It is, again, overruled. The answer will stand.
> . . . .
> A. So I was the one that turned him in and I felt guilty for it for a lot of years because there was no way for me to prove it. I couldn't make it stop. And I wanted to make sure this stopped.
> Q. To you, this was the right way to handle things? A. It's all I could think of because I know how—If you don't have proof, if you can't prove it, if you can't—Nobody looks—Yes.

Julie Ritland, a nurse practitioner at the Child Protection Center who conducted L.'s interview, testified she performed a medical exam of L. on Tuesday, September 28, 2021. L. stated she was there because she had reported that her father had been sexually abusing her, with the last time being Sunday night to Monday morning. L. told her there was probably more Ritland should know.

> She talked about when the abuse started, and she had said that she was [fourteen] and he had started touching her and then it went on from there. And so when she said that, I asked her more

about, like, what had happened to her body and what type of contact it was. And then she talked about—

Q. Was she able to describe the context to you? A. She was.

Q. And what was that? A. She had told me it had been ongoing. She told me the last time they had sex was Thursday, last Thursday. She had clarified that she had had vaginal, anal, and oral sex on multiple occasions spanning over several years.

Ritland's testimony continued:

I usually ask if there's coercion or threats or, you know, like what they say to them. And she reported that he attempted to normalize the behavior, saying that, "It is only weird if you make it weird."

She also talked about some coercion with allowing her to do things. If she engaged in sexual activity with him, then she would be allowed to go and do other things like normal, as she said, "And I had to do that so that any kind of normal fun life."

And then, of course, I asked about contact and exposure, were condoms used, that sort of thing to assess risk, basically, of pregnancy and STDs. . . .

She said she denies that condoms were ever used and that she reported her father had had a vasectomy. . . .

. . . She reported exposure to a sex toy that was not her own. That raises my suspicion for possible STD transmission because we don't know what anyone else can have.

Ritland testified that in addition to the medical exam, L. completed a screening tool, which indicated a moderately severe depression. Ritland recommended L. receive individual counseling.

Ritland's report noted, "There's no residual, physical, diagnostic sign of sexual or physical abuse in our examination today." She testified that does not mean L. did not have sexual contact because "[i]t is unusual to actually see injuries. It's far more common to see a normal exam."

Davis chose to testify. He denied any sexual contact with L. He explained he was confused during his interview with Hedlund and he stated, "I didn't do

anything to admit guilt or not guilty to—but I was trying to make sense of what was going on that day."

The jury convicted Davis of two counts of third-degree sexual abuse and two counts of incest, and it acquitted him of four other charges. Davis's motion for new trial was denied. The court imposed consecutive sentences for a total term in prison of thirty years.

Davis appeals.

**II. Scope and Standard of Review.**

Evidentiary rulings, rulings whether the verdict is against the weight of the evidence, and sentencing decisions within statutory limits are reviewed for an abuse of discretion. *See State v. Stendrup*, 983 N.W.2d 231, 238 (Iowa 2022) (evidentiary); *id.* at 246 (weight of the evidence); *State v. Formaro*, 638 N.W.2d 720, 724 (Iowa 2002) (sentencing). An abuse of discretion will not be found unless the court's decision was "exercised on grounds or for reasons that were clearly untenable or unreasonable." *Formaro*, 638 N.W.2d at 724.

"In evaluating sufficiency-of-evidence claims, we will uphold a verdict if substantial evidence supports it." *State v. Wilson*, 941 N.W.2d 579, 584 (Iowa 2020) (citation omitted). "Evidence is considered substantial if, when viewed in the light most favorable to the State, it can convince a rational jury that the defendant is guilty beyond a reasonable doubt." *Id.* (citation omitted).

**III. Discussion.**

*A. Evidentiary ruling.* Davis first contends the trial court abused its discretion in overruling his objection to Patti's testimony about having been sexually abused as a child. He asserts the testimony was irrelevant.

Evidence is relevant if it has any tendency to make a fact that is of consequence in determining the action more or less probable than it would be without the evidence. Iowa R. Evid. 5.401.

Davis argues Patti's experience with sexual abuse is not relevant to any of the issues in his trial. The State responds the testimony was relevant to the defense's direct examination related to Patti's purported plan to catch the defendant in order to "black-mail" him. The inference being that Patti and L. had a motive to lie to get rid of Davis. The State offered the evidence to explain Patti's actions over the five days in September after L. first told her about the abuse. The defense's objection itself indicates the relevance, "It's not impeachment. It is—I believe the State's question is going to the state of mind of the witness at the time." The trial court did not abuse its discretion in overruling the relevance objection.

In the alternative, Davis asserts any probative value the testimony may have had is substantially outweighed by the danger of unfair prejudice. *See* Iowa R. Evid. 5.403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."). "Unfair prejudice means the 'evidence has an undue tendency to suggest a decision on an improper basis.'" *State v. Lacey*, 968 N.W.2d 792, 807 (Iowa 2021) (citation omitted). "Weighing probative value against prejudicial effect is not an exact science, so we give a great deal of leeway to the trial judge who must make this judgment call." *Id.* (internal quotation marks and citations omitted).

We are not persuaded Patti's testimony led the jury to reach a decision on an improper basis. Especially in light of the offenses with which Davis was accused—vaginal and oral sex and digital penetration of a child in his household over an extended period—it is unlikely the jury was unduly swayed by Patti's brief testimony about sex abuse by a neighbor boy years ago.

*B. Sufficiency of the evidence.* Davis maintains the verdicts are not supported by sufficient evidence. With respect to counts III and IV, the incest and sexual abuse charges "[d]uring the months of May through September 2020," Davis challenges the lack of specificity of the dates.

"[W]e are highly deferential to the jury's verdict. The jury's verdict binds this court if the verdict is supported by substantial evidence." *State v. Burns*, 988N.W.2d 352, 370 (Iowa 2023) (alteration in original) (citation omitted).

Iowa Code section 709.4 (2020) defines third-degree sexual abuse; it does not make a particular time period a material element of the offense. *See State v. Griffin*, 386 N.W.2d 529, 532 (Iowa Ct. App. 1986) (holding statute defining crime of second-degree sexual abuse "does not make a particular time period a material element of the offense"); *accord State v. Laffey*, 600 N.W.2d 57, 60 (Iowa 1999) (holding uncertainty of precise date of offense "is immaterial"); *see also State v. Yeo,* 659 N.W.2d 544, 550 (Iowa 2003) ("This approach is consistent with the language of the statute, as well as our general rule that the State is not required to prove the precise time and place of a crime. It is also compatible with the very nature of child abuse, and the inherent difficulty of establishing precise times and places of abuse to children due to the frequent delay in the discovery of the abuse,

as well as other factors based on the nature of the crime." (internal citations omitted)).

L.'s testimony standing alone provided substantial evidence to support the convictions. *See State v. Trane*, 934 N.W.2d 447, 455 (Iowa 2019) (holding that the victim's testimony, "standing alone, is sufficient to support [the defendant's] conviction" for assault with intent to commit sexual abuse). L. testified the abuse started in spring 2020. She testified about a number of specific instances thereafter, including the time she went to do laundry in the basement and Davis's introduction of sex toys. She testified Davis warned her not to tell anyone or he would make her life "hell." And without making this opinion unduly lengthy, other evidence corroborated L.'s testimony in a number of respects.

With respect to counts V and VI, sex abuse and incest on September 23, 2021, Davis notes L. described only general sexual acts and inappropriate things being done to her. He also notes that in a prior deposition, L. had said nothing happened that night. Davis asserts there is insufficient evidence to support these charges.

It is the jury's duty to decide what testimony to believe. *Trane*, 934 N.W.2d at 455 ("The jury is entitled to reject a party's evidence and credit the evidence against it."). Here, L. testified Davis performed a sex act on her the evening of September 23, 2021. L. remembered he did "something" because he got on top of L. during a workout and did more than "just touch[]" her. She later explained that he touched her vagina with his fingers that night during a workout. The interviewing nurse testified L. told her the last time Davis had sex with her was the previous Thursday, that is, September 23. When Davis was interviewed by

investigator Hedlund on September 27, Davis stated, "It's been a few days" since "the last time [he] had [his] finger inside [L.'s] vagina." There is substantial evidence to support the convictions.

*C. Weight of the evidence.* Davis next asserts the court abused its discretion in overruling his motion for a new trial on the ground the verdicts are against the weight of the evidence. "Our review is not to determine whether the verdict is contrary to the weight of the evidence but only to determine whether the district court abused its considerable discretion in denying the motion." *Stendrup*, 983 N.W.2d at 246. The district court should only grant a motion for new trial "in the extraordinary case in which the evidence preponderates heavily against the verdict rendered." *State v. Ary*, 877 N.W.2d 686, 706 (Iowa 2016). This is not such a case, and we find no abuse of discretion.

*D. Sentencing.* Finally, Davis asserts the court abused its discretion in imposing consecutive sentences rather than concurrent sentences. "[T]the decision of the district court to impose a particular sentence within the statutory limits is cloaked with a strong presumption in its favor, and will only be overturned for an abuse of discretion or the consideration of inappropriate matters." *Formaro*, 638 N.W.2d at 724.

> Here, the trial court explained the imposition of consecutive sentences was
>
> because they provide for Defendant's rehabilitation, the protection of the community. Further, the Court has considered the facts and circumstances which are egregious in the Court's eyes surrounding the offenses noted herein and the repetitive and ongoing nature of the abuse referenced.

We find no abuse of the court's sentencing discretion. Rehabilitation of the defendant, the protection of the community, and the nature of offenses are all proper sentencing considerations. *See* Iowa Code §§ 901.5, 907.5.

Finding no merit in Davis's claims on appeal, we affirm.

**AFFIRMED.**