# IN THE COURT OF APPEALS OF IOWA

No. 16-1786
Filed May 16, 2018

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**TIMOTHY ROGER SCHROEDER,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Woodbury County, Jeffrey A. Neary,

Judge.


        Timothy Schroeder appeals from judgment and sentences entered upon his

convictions for first-degree murder, going armed with intent as a habitual offender,

and being a felon in possession of a firearm as a habitual offender.  **AFFIRMED**

**IN PART, REVERSED AND REMANDED IN PART.**



        Mark C. Smith, State Appellate Defender, and Mary K. Conroy, Assistant

Appellate Defender, for appellant.

        Thomas J. Miller, Attorney General, and Sharon K. Hall, Assistant Attorney

General, for appellee.


        Considered by Danilson, C.J., and Mullins and McDonald, JJ.

**DANILSON, Chief Judge.**

Timothy Schroeder appeals from his convictions for murder in the first degree, going armed with intent as a habitual offender, and being a felon in possession of a firearm as a habitual offender.  Schroeder argues (1) trial counsel was ineffective for failing to challenge the corroboration of testimony by his wife, (2) the court erred in failing to redact statements from his recorded interview with law enforcement, and (3) his stipulation to the habitual-offender sentencing enhancements was procedurally faulty and, thus, not knowing and voluntary.

Schroeder's ineffectiveness claim fails because he cannot prove the claimed breaches of duty resulted in prejudice.  We find no abuse of discretion in the extent Schroeder's recorded interview was redacted.  Finally, while the convictions for going armed with intent and for being a felon in possession of a firearm are supported by substantial evidence, because the court ordered the sentences imposed upon those convictions are to be served consecutive to the life-without-parole (LWOP) sentence, and there is a possibility a LWOP sentence could be commuted or the conviction overturned notwithstanding our decision, we reverse Schroeder's stipulation to being a habitual offender and remand for further proceedings on the sentencing enhancement and resentencing on the convictions for going armed with intent and being a felon in possession of a firearm.

**I. Background Facts and Proceedings.**

At about 7:00 a.m. on January 9, 2015, Nicole Gray's seventeen-year-old neighbor entered Gray's home to care for her pets while Gray and her children were out of the country.  The minor found Gray's boyfriend, Dustin Wilder, lying face down in a pool of blood in the kitchen and unresponsive.

Emergency response personnel were called and determined Wilder was deceased. Law enforcement officers arrived approximately five to ten minutes after the medical responders. An officer noted an empty shell casing on the floor between the kitchen and the living room. A blue chair with a broken spindle was leaning against the refrigerator. Wilder's hat was upside down on the kitchen floor and there were beer cans on the table.

The county medical examiner (ME) came to the house but was unable to determine the cause of death at that time. Later that afternoon, the ambulance transported Wilder's body to the hospital for an autopsy, which revealed a gunshot wound to the left backside of Wilder's head. There was no exit wound. Wilder also had a small laceration near the bullet entry and an abrasion by his right ear. The ME removed bullet fragments for testing. Law enforcement later located a metal fragment in the blood on the kitchen floor. Based on the blood splatter and the location of the wound, the ME opined Wilder had been shot while he was lying on the floor.

While the police were at Gray's home, James Munhofen arrived. Munhofen had been alerted by a friend that the police were at Gray's house and he went over to see what was happening. Munhofen told police that he and Wilder had been at the Sloan Tap the night before and Munhofen had left before Wilder. Police then learned from the bartender that Wilder had left the bar with Amanda and Timothy Schroeder at about 2:00 a.m. on January 9.[1] The police obtained the video surveillance recordings from the bar and an "IOU" note Amanda had left with her

---

[1] Amanda and Timothy Schroeder are married. Because they share a last name, we will refer to the defendant as Schroeder and to his wife as Amanda.

contact information. Law enforcement subsequently interviewed several individuals and were able to piece together the following.

On Tuesday, January 6, 2015, Schroeder was paroled and released from custody in the Sioux City area. At about 11:00 a.m., Schroeder was picked up at a friend's house by Dustin Duncan and Amanda in Amanda's white Buick. Amanda did not have a driver's license, and Duncan, who had known Amanda for a couple months, was a homeless methamphetamine user who helped Amanda by driving for her. The record shows Amanda appeared to have no permanent address and had been staying at different places, including motels, her grandmother's house in Sioux City, and the Guzman residence in South Sioux City.

Duncan asked about Schroeder having to report to his parole officer. Schroeder told Amanda he did not have to immediately report. Schroeder used Amanda's cell phone while they were riding in the car. Duncan overheard Schroeder on the phone "ranting and raving" and talking about weapons including a pistol and an "AR".[2] Duncan heard Schroeder say he was supposed to go to a residential treatment facility (RTF) but he was not going to turn himself in stating, "[T]he next time they're going to get [me] is going to be for murder." Amanda recalled Schroeder saying if he was going to "go back" it was going to be for "something big."

---

[2] An "AR 15 is the civilian version of the military's M4 carbine. Contrary to what most people believe AR doesn't stand for assault rifle, rather it stands for the original manufacturer Armalite Rifle. AR 15 is semiautomatic and doesn't meet Federal requirements to be classified as an assault rifle." *AR 15*, Urban Dictionary, https://www.urbandictionary.com/define.php?term=AR%2015 (last visited Apr. 24, 2018).

About 11:50 a.m. on January 6, several text messages were sent from Amanda's phone to Corey O'Neill, a person Schroeder had met in jail. The first stated, "I need a pistol for the day and I'll give u a glock 40 when I get it this week"; followed by, "Actually I need it by 3ish sorry bro"; then, "Fuck seriously. I'm not gonna use it I think. Just need it going into hostile territory"; and then, "We need to talk about some things when u can if u don't mind." At 3:20 p.m., a text from O'Neill's phone to Amanda's phone stated, "I got a chick with me that can't know shit."

At about 3:00 p.m., Duncan was feeling unsettled by Schroeder's behavior and asked to be dropped off. Schroeder then drove Amanda's car to O'Neill's house to look at a .40 caliber Taurus semi-automatic pistol. O'Neill let Schroeder take the Taurus pistol in a black case along with two full clips and a partial box of ammunition. Amanda was in O'Neill's house but was not in the room where Schroeder and O'Neill were discussing the gun.

At 5:25 p.m. on January 7, Schroeder sent O'Neill the following text: "Dude I seriously about shot this dude because he was getting stupid." At some point that day, Schroeder and Amanda went to a rural location between Salix and Sloan and both test-fired the gun. The gun jammed. At 10:22 p.m., Schroeder sent a text to O'Neill: "Gun jams 2 much." O'Neil responded, "It needs cleaned."

On Thursday, January 8, Schroeder sent texts to O'Neill about covering for him with his parole officer.[3] That afternoon Schroeder called his parole officer,

---

[3] At 12:45 p.m., "I need u to cover me if my parole officer calls u… I have been working for u so I can pay my Nebraska fines.. is that o.k.?" At 1:31 p.m, "What kinda work m I doing so I can tell him."

Emmanuel Scarmon, claiming that he did not know he was supposed to report when released. Schroeder then set an appointment for 9 a.m. on January 9.

Thursday evening, Amanda and Schroeder headed to Sloan. Amanda hoped to meet a former boyfriend, Corey Schuknecht, to collect a sweatshirt and forty dollars he owed her. Driving in near-blizzard conditions, they got stuck in a snow drift on the edge of Sloan near Archie Kelly's home. Kelly first provided Schroeder with a shovel, and later helped Schroeder pull the car out with twine attached to his truck and the Buick's radiator bracket. Schroeder told Kelly they were from Omaha and were headed to Sioux City to meet friends.

A few minutes after getting unstuck, Schroeder had to stop near a bank in Sloan to tie down the hood because the latch had broken during the towing efforts. At 11:04 p.m., Woodbury County Deputy Patrick Hinrichsen drove by a man working on the hood of a vehicle in front of a bank and offered to help. The man (Schroeder) declined.

That same night, Thursday, January 8, Munhofen and Wilder met at the Sloan Tap after work and then left to go to Wilder's home to play video games. They returned to the bar around 9 p.m.

Sometime after midnight, Schroeder and Amanda arrived at the Sloan Tap because Amanda knew Schuknecht went there on occasion. Munhofen was there with Wilder. Amanda was familiar with Wilder and the bartender, Lisa Murdock, because they had all lived in the same apartment building some years earlier. Wilder helped Schroeder secure the hood of Amanda's car with wire. Wilder spoke to Amanda and reportedly bought her a drink. Schroeder spoke very little to anyone. Also in the bar during the early-morning hours were patrons Emily

Musack and Richard Pope. Everyone was drinking except Schroeder, and Murdock believed that Amanda and Wilder exhibited signs of intoxication. Patrons also saw Amanda playing with a Taser, but she was not threatening anyone with it. No one observed any problems between Munhofen and Wilder, and no one heard any arguments, raised voices, or fighting between Schroeder and Wilder.

Around 1:30 a.m. on January 9, Munhofen decided to go home but Wilder wanted to stay. Murdock recalled Schroeder and Amanda offered to give Wilder a ride home. Munhofen recalled it was Schroeder who offered Wilder a ride. Wilder did not have his cell phone, having either lost or misplaced it earlier in the evening. Munhofen loaned Wilder forty dollars before leaving the bar. Munhofen left without Wilder.[4] Musack left the bar shortly after Munhofen. Pope was still there when Wilder left with Schroeder and Amanda around 1:50 to 1:55 a.m. Before leaving, Amanda tried to pay her tab of $19.50 with a credit card. The card was declined and Amanda gave Murdock an IOU with Amanda's name, address,[5] and phone number. The IOU states, "Will be back in morning to pay or ask Cory Schu[knecht]"[6] and included Schuknecht's phone number.

According to Amanda, she and Schroeder, drove Wilder to Gray's house and went inside with him. Amanda went to use the bathroom and recalled Wilder sitting in a blue chair at the kitchen table and Schroeder standing by the refrigerator. Amanda joined the men in the kitchen, sitting on a bench by the kitchen table. She and Wilder drank more. Amanda again left the kitchen and

---

[4] Munhofen's mother woke up when he came home between 1:50 and 2 a.m.
[5] The address Amanda provided was that of Maria Guzman.
[6] The spelling of Schuknect's name is questionable in the handwritten note.

when she returned, Schroeder said, "[Y]ou don't want to see this," pushing her back around.  Amanda heard a gunshot and turned to see Wilder on the floor and Schroeder standing with a gun in his hand.  Pointing the gun at her, Schroeder told Amanda to go to the car, and she complied.  They drove back to Sioux City and spent the rest of the night in a parking lot.  Schroeder and Amanda then drove to the RTF building and Schroeder attended his 9:00 a.m. appointment with his parole officer.  At the meeting, Schroeder told Scarmon he had been with his wife the last few days and had gone to Omaha with her, and he was planning to work with or for his friend Corey O'Neill.  Scarmon arrested Schroeder for a parole violation.  Scarmon had Schroeder give his wallet, ring, and cell phone to Amanda, who was still in her car in the parking lot.

Schroeder called Amanda from jail at 9:44 a.m. asking her to give O'Neill a message, and she asked if he wanted her "to give that back to Corey."  At 9:50 a.m. Amanda sent a text to O'Neill, "U awake."  Not until 1:45 p.m. did O'Neill respond with the text, "Barely."  Amanda then told O'Neill Schroeder was in jail, and "I gotta drop something off to you."

Because Amanda did not have a license, she called for Jose Guzman (Maria Guzman's son) to pick her up and drive her from the RTF back to Guzman's house.  Carlos Mendez also lived there with his wife and two daughters in a basement room he rented.  Amanda asked Guzman and Mendez to help her clean out her car because she did not want anything to do with the gun (the Taurus) that was in the backseat.  Amanda asked Mendez to store the gun.  Mendez testified Amanda forced him to take the gun because she had done him favors in the past.  Mendez placed the gun and accessories in a sack on a wall.  Amanda then left

with Guzman for several hours. When she returned, Amanda had groceries for Mendez's family.

That afternoon, Mendez went to a relative's house and asked the relative to keep the gun for a day. Mendez promised to return the following day and collect it. His relative hid the gun in a box behind the television.

In the meantime, after speaking to Munhofen, Woodbury Detective Norm Petersen spoke to Murdock, who gave the detective Amanda's IOU with her contact information. Deputies met Amanda late Friday afternoon at her grandmother's house in Sioux City. Amanda told them about Schroeder's efforts to acquire a gun, where he had tested the firearm between Salix and Sloan, and their car troubles in Sloan on Thursday night. She also told them about Duncan and O'Neill. Detective Petersen interviewed O'Neill who told him about giving Schroeder a firearm, and Amanda's text telling him Schroeder was back in jail and that she wanted to return something to him.

Around 10 p.m. deputies brought Amanda in for a second interview to find the location of the firearm. In their presence, Amanda contacted Jose Guzman who told her that Mendez had the gun. Deputies continued questioning Amanda while South Sioux City officers made arrangements to search the Guzman home. Officers woke up Maria Guzman and the other occupants late Friday night or early Saturday morning. They found Mendez in the basement. There Sergeant Jeremy Grace observed what appeared to be a .40 caliber bullet on the floor and an empty ammunition box. Mendez told officers where he had taken the gun and led them to his relative's home. There officers located a box containing the loaded Taurus

pistol, a second loaded magazine, and bullets in a clip. A short time later Detective Petersen took possession of the firearm and related items.

Detective Petersen spoke to Amanda a third time on Saturday morning, January 10, and had her take deputies to the location where she and Schroeder had test-fired the gun obtained from O'Neill. There, deputies found thirteen shell casings.

Detectives Jansen and Peterson interviewed Schroeder on January 13. Schroeder claimed he had not been told to report to his parole officer immediately upon release. He told detectives he had been doing drywall and flooring work with O'Neill and he and Amanda were staying with O'Neill. Schroeder did not initially admit that they were in Sloan late Thursday night into early Friday morning. He later admitted to being in Sloan at the Sloan Tap and to driving Wilder home. However, Schroeder maintained he and Amanda helped Wilder inside, helped him find his cell phone, and then left and headed back to O'Neill's house. Schroeder insisted he had told them everything. He also denied possessing or firing a gun during the last week.

On January 17, Gray found Wilder's cell phone outside her house near the curb and turned it over to Deputy Derek Brand.

Schroeder was charged with murder in the first degree, going armed with intent as a habitual offender, and being a felon in possession of a firearm as a habitual offender. Prior to the start of trial, Schroeder sought to redact portions of his interview with police,[7] asserting:

---

[7] By agreement of the parties, the interview had been redacted already. Schroeder asked for additional redactions.

> Much of statement is officers talking about who is lying (listed witnesses and Defendant) and trying to get Mr. Schroeder to confess. Many of the statements are not relevant and prejudicial and should not be heard by the jury. Allowing those statements would violate Defendant's right to a fair and impartial trial violating his rights under Article 1 sections 9, and 10.

He objected to specific statements made during the interview referencing that he was "on paper" or on parole. He also argued some statements should be inadmissible because they constituted hearsay and other statements consisted of the officers vouching for the credibility of witnesses.[8] The district court ordered some portions of the recorded interview further redacted, but overruled most of Schroeder's objections.

During the seven-day trial, Amanda testified that prior to Schroeder's release on January 6, 2015, she had pancreatitis, had been hospitalized, and was taking prescription medication, including sleep medication. The night before picking Schroeder up, she and Duncan had stayed in a hotel. She also acknowledged drinking heavily. Amanda testified to the events leading up to January 9. She stated she was at O'Neill's residence with Schroeder but did not see the gun while there because Schroeder and O'Neill were in another room. She testified she test fired the gun while on a road on Wednesday, January 7, at

---

[8] Schroeder noted the officers informed him that they had talked to many people and watched video that tells "a whole different story than what [Schroeder] just told" them. The detectives told Schroeder several times the people they interviewed had consistent stories, unlike Schroeder. The officers also told him they had sworn testimony from people that was inconsistent with his version and accused him of not being honest and being deceptive. One detective said there was a sworn statement there had been an argument between Wilder and Schroeder. One detective asked him if the other people lied and magically came up with the same lie and questioned why they should believe him over all the other people they had already interviewed. The officers talked about Amanda, O'Neill, Duncan, Guzman, and Mendez and how those witnesses do not have any reason to lie to the police. The officers also mentioned other witnesses that did not testify as being without motive to lie.

Schroeder's urging. Amanda stated that after taking Wilder home from the Sloan Tap, she and Schroeder went inside and she was sitting at the table on the bench. She got up from the table to blow her nose and when she returned to the kitchen Schroeder pushed her aside and told her she did not want to see. She testified that when Schroeder pushed her, she was turned around. She then heard gunshots, and then turned back towards Schroeder, who told her to go outside and get in the car. Amanda testified she saw a gun in Schroeder's hand and Wilder was lying on the floor on the other side of the table. She denied seeing Schroeder hit Wilder with anything, and she had no explanation of how the blue chair broke.

On cross-examination Amanda admitted testifying at her December 18, 2015 deposition that she did not see a gun at Wilder's but heard the gunshots.

On redirect, the prosecutor asked Amanda about the first sworn statement she made on January 12, 2015, when Amanda said she was leaving the bathroom when she heard a thump and Schroeder and Wilder arguing. In that statement, Amanda claimed she heard Schroeder say, "That's my wife," before shoving her, and she stated Schroeder pointed the gun at her after she heard two gunshots so she left the house. On re-cross examination, Amanda admitted her deposition testimony differed in some respects.

Schroeder's redacted interview was played at trial.

Several items from Wilder's house and Amanda's car, Amanda and Schroeder's clothing, Wilder's clothing, the bullet fragments, and shell casings were all sent to the Division of Criminal Investigations (DCI) laboratory for testing. DCI criminalist Richard Crivello testified he was unable to get identifiable fingerprints from the two magazines, the bullets inside the magazines, the bullet

that was chambered in gun, the shell casing found next to Wilder's body, and a beer can found on the kitchen floor. A latent print found on the back of the blue chair did not match the prints of Schroeder, Wilder, Gray, Gray's son, or Munhofen.

DCI criminalist Tara Scott testified blood was found on the jeans Amanda was wearing the night of January 8 into the morning of the 9th. There was a mixture of DNA of two people, one of which was Amanda; however, there was not sufficient DNA to identify the other contributor. The criminalist did not find DNA or blood on either Amanda or Schroeder's shoes; on Schroeder's coat, shirt, or jeans that were taken from him when he was arrested;[9] or on the two pairs of gloves and a ski mask collected from Amanda's car. The Taurus pistol did not have any blood on it. DNA testing on the barrel of the gun did not render a profile. However, DNA found on the guide rod of the handgun (located beneath the barrel) was consistent with Schroeder.

DCI criminalist Victor Murillo examined and test-fired the Taurus pistol and determined that the shell casing from the crime scene, the casings from the gravel road location, and the fragment from Wilder's head were all fired by the same gun. Murillo also examined Wilder's shirt looking for gunshot residue and identified particles on the left front shoulder and the back of the shirt. Based on the gunshot residue, Murillo opined that the shooter was between three and six feet from the victim.

Duncan and Mendez testified that Jose Guzman and Amanda were dating and in a romantic relationship. Maria Guzman also identified Amanda as

---

[9] Schroeder was wearing the same clothes at the time of arrest as he had on while in Sloan.

Guzman's girlfriend. However, both Amanda and Guzman denied they were dating, stating they were friends who met at their job.

Several witnesses testified Amanda had a drinking problem. Duncan estimated she drank a gallon of Black Velvet (whisky) daily. Duncan stated Amanda always kept a twenty-ounce bottle of the liquor on her and kept a bigger bottle in her car that she would refill; Amanda denied this. However, both Mendez and Guzman also testified Amanda always carried around a bottle of Black Velvet. When police seized her car, they found an opened bottle of Black Velvet in it. Mendez testified Amanda was often intoxicated. Duncan testified Amanda was able to hide her intoxication and had a high alcohol tolerance. Amanda denied ever drinking a whole bottle a day, but she testified she did drink more than five drinks a day and sometimes more than ten drinks a day. On cross-examination, Amanda admitted she was drinking consistently for weeks leading up to Wilder's death, only quit drinking a week after, and would have had more than ten drinks daily.

Cell site technician Brent Dewald analyzed call detail records for cell phones possessed by Amanda, O'Neill, Duncan, and Wilder, and created maps identifying which cell towers were routing calls on a particular phone from 10 p.m. on January 8 until 11 a.m. on January 9. Dewald determined no calls were made or received during that period on Wilder's phone or O'Neill's two phones. During that same period, the calls made or received on Duncan's phone were routed through Sioux City metro towers. Calls made or received on Amanda's phone that evening were processed by towers in Sioux City, Salix, and Sloan. Dewald opined that because

the Salix sector points almost directly at Sloan a person could be inside the Sloan Tap and use the Salix tower rather than the Sloan tower.

On day six of the seven-day trial, Schroeder informed the court he would stipulate to two prior felony convictions. The district court stated,

> Mr. Schroeder, by stipulating to that conviction, you're going to be admitting and be establishing that fact for purposes of that particular offense that you—if you're found to have possessed a firearm—to be a felon in possession of that firearm. But you're essentially stating that you were a convicted felon and you were at the date of the trial information.
> . . . .
> What I want to do, then, Mr. Schroeder—so you understand, is this—and I'm going to explain to you before I actually ask you for it, it is—A habitual offender is a sentence enhancement. And what I would typically do when someone ultimately pleads guilty is I actually go through a few—a series of questions about each conviction and get their answers. And then if the answers are correct, then I ask them if they admit or deny. And when I do that, if I take your admission—and assuming you do admit that you have these two prior felony convictions—then in the event of a conviction on any one or more of the charged offenses here, then I would—at the time of sentencing—apply the habitual offender, as appropriate. So I just want to make sure you understand that's what this is all about.
> So if you admit these, you essentially will take away the right you have to have a jury decide whether or not you have these two prior convictions and that you're the person that has these two prior convictions.
> Do you understand all that?
> THE DEFENDANT: Yes.

Schroeder then acknowledged he had been convicted of second-degree theft on August 25, 2013, and again on January 5, 2015. He also acknowledged he was represented by counsel during those prior proceedings. The State introduced exhibits related to the prior convictions and then continued to present its case in chief.

At the close of the State's case in chief, Schroeder moved for judgment of acquittal, asserting there was insufficient evidence for any of the charges:

Clearly we've established that Mr. Schroeder is a felon. I would argue there's not sufficient competent evidence presented to the jury to create a jury question that he actually either knowingly had under his dominion or control or possession, or received or transported, or caused to be transported, a firearm on or about January 9th of 2015. I would argue the evidence is not sufficient to create a jury question and I'd ask that the Court enter a judgment of acquittal on Count Number 3.

I have a similar argument to Count Number 2; that the State has not shown that Mr. Schroeder was armed with a dangerous weapon, that he carried this from one place to another with the intent to use that against another person. I would argue there's not sufficient competent evidence that has been presented by the State to create a jury question on that charge. And I'd ask the Court to enter a judgment of acquittal on that charge.

As for the charge of murder in the first degree, the—I would argue that the State has not presented sufficient competent evidence to sustain a conviction on any one of the elements in the murder in the first degree charge, other than the fact that the victim died of a gunshot wound, that has been proved beyond a reasonable doubt.

But I would argue that the State has not presented sufficient evidence to show or to raise a jury question that that was an act that was done by Mr. Schroeder. They did not establish any evidence to show that he acted with malice aforethought. That he willfully, deliberately with premeditation with the specific intent to kill did anything on that evening.

I think the best that has been shown by the State's evidence is that at some point Mr. Schroeder was in Sloan. He was in the house at some point and that's all I think the State has been able to prove by the evidence they presented. So I would ask the Court also then to grant a judgment of acquittal on Count 1 for those reasons. Thank you.

The defense motion was overruled. Schroeder presented no evidence and did not object to the court's proposed jury instructions. Schroeder was convicted as charged.

In a motion for new trial, he asserted the convictions were contrary to the weight of the evidence. The district court overruled the motion for new trial, concluding the evidence supporting the verdicts was "quite considerabl[e]" and "[a]mple."

The district court entered judgment and sentences—for first-degree murder Schroeder was sentenced to a term of life-imprisonment without possibility of parole (LWOP), and on the felon-in-possession and going-armed convictions, he was sentenced to two concurrent indeterminate terms of imprisonment enhanced to fifteen years, with a mandatory minimum of three years, which sentences were to be served consecutive to the LWOP sentence.

On appeal, Schroeder contends trial counsel was ineffective in not arguing Amanda was an accomplice and that her testimony was not adequately corroborated. He also asserts the court abused its discretion in not redacting his recorded interview further. Finally, Schroeder argues his habitual-offender stipulation was not knowing and voluntary because the court did not inform him of the minimum and maximum sentences resulting from the sentencing enhancement or of the three-year mandatory minimum sentence.

**II. Scope and Standard of Review.**

Ineffective-assistance claims are grounded in the Sixth Amendment and article I, section 9 of the Iowa Constitution. *State v. Virgil*, 895 N.W.2d 873, 879 (Iowa 2017). We review constitutional claims de novo. *Id.*

Evidentiary rulings are reviewed for an abuse of discretion. *In re Detention of Blaise*, 830 N.W.2d 310, 315 (Iowa 2013).

**III. Discussion.**

*A. Ineffective assistance of counsel.* "Generally, claims of ineffective assistance of counsel are preserved for postconviction relief proceedings." *State v. Soboroff*, 798 N.W.2d 1, 8 (Iowa 2011). But if "the record is adequate, we may

resolve the claim on direct appeal." *Id.* We conclude the record here is adequate to address Schroeder's ineffective-assistance claim.

A defendant making a claim of ineffective assistance of counsel must prove by a preponderance of the evidence that counsel failed in an essential duty *and* that failure resulted in prejudice. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). On the duty prong, Schroeder must show "counsel's representation fell below an objective standard of reasonableness" considering all the circumstances. *See id.* at 688. On the prejudice prong, Schroeder must show but for counsel's unprofessional errors, a reasonable probability exists the outcome of the proceeding would have been different. *See id.* at 694. Inability to satisfy either prong is fatal to an ineffectiveness claim and therefore, we may resolve the defendant's claim on either prong. *State v. Neitzel*, 801 N.W.2d 612, 624 (Iowa Ct. App. 2011).

Our case law defines an accomplice as someone who "could be charged with and convicted of the specific offense for which an accused is on trial." *State v. Douglas*, 675 N.W.2d 567, 571 (Iowa 2004) (citation omitted). Standing alone, proof that a person knew the accused was planning the crime or was present when the accused committed the crime is not enough to brand the person as an accomplice. *Id.* The defense must show by a preponderance of the evidence the person was somehow involved in the commission of the crime. *Id.* "When the facts and circumstances are undisputed and permit only one inference, whether a witness is an accomplice is a question of law for the court." *Id.* But if the facts are disputed or give rise to different inferences, the accomplice question is for the jury. *Id.*

Schroeder contends trial counsel breached an essential duty in failing to assert that Amanda was an accomplice and the only witness against Schroeder regarding the murder and going-armed-with-intent charges. Even if we assume Amanda was an accomplice, in order to show the requisite prejudice, Schroeder must establish that her testimony was not corroborated.

Corroborating evidence may be either direct or circumstantial; it need not be "strong" proof of guilt, so long as it backs a material aspect of the accomplice's testimony and tends to link the accused with the commission of the offense. *State v. Yeo*, 659 N.W.2d 544, 548 (Iowa 2003); *see also State v. Berney*, 378 N.W.2d 915, 918 (Iowa 1985), *overruled on other grounds by State v. Bruce*, 795 N.W.2d 1, 3 (Iowa 2011).

At trial and on appeal, Schroeder emphasizes Amanda was not credible and points to her alcohol intake. The State acknowledges Amanda was admittedly a heavy drinker and under the influence of alcohol during the events at issue, but notes the evidence that she had a high tolerance for alcohol and law enforcement testimony that she did not appear to be intoxicated during her interviews with law enforcement. The jury found Schroeder guilty of first-degree murder and going armed with a dangerous weapon. Thus, the jury impliedly found Amanda's testimony credible. *See State v. Shanahan*, 712 N.W.2d 121, 135 (Iowa 2006) ("The function of the jury is to weigh the evidence and 'place credibility where it belongs.'" (citation omitted)). The trial court rejected Schroeder's assertion that the verdicts were against the weight of the credible evidence, finding "when you review all the evidence in this case in the light most favorable to the State of Iowa, it supports—quite considerably—the jury's verdict."

The State notes Schroeder was released from custody of the Woodbury County Jail on January 6, 2015, and he was required to immediately surrender to the RTF because he was on parole. Duncan testified that on the same day Schroeder was released from custody, he stated that he was not going back to jail unless it is for murder. Amanda stated Schroeder said he was not going back to jail unless he was going back for something big. Schroeder also talked to O'Neill that same date about getting a firearm. O'Neill confirmed he gave Schroeder the Taurus pistol the following day. Amanda testified Schroeder test-fired the Taurus pistol on a gravel road outside of Sloan. Text messages between Amanda's phone and O'Neill support that Schroeder did shoot the Taurus pistol and spent casings were found where Amanda led the officers. Schroeder's DNA was found on the guide rod of the weapon. On Thursday, January 8, Schroeder's parole officer Scarman directed him to surrender on the morning of Friday, January 9, 2015. Several witnesses testified about Schroeder's presence at the Sloan Tap and seeing Wilder leave with Schroeder and Amanda at about 2:00 a.m. on January 9. Schroeder eventually told detectives he was in Wilder's house after leaving the bar; he claimed he and Amanda left after helping Wilder find his phone. However, Wilder's phone was found outside in the snow several days later.

In response, the State points to Schroeder's lack of candor with police when they interviewed him, the text messages between Amanda's phone and O'Neill, O'Neill's statement he gave the gun to Schroeder, Duncan's testimony about Schroeder's phone conversations and Schroeder's assertion he was not going to return to prison unless it was for murder, and Schroeder's phone conversation with Amanda from jail about getting the gun back to O'Neill. The State also notes that

the .40 caliber Taurus pistol in Schroeder's possession was undisputedly the gun that fired the fatal shot. The autopsy indicated Wilder was struck with a blunt instrument on both sides of his head likely causing him to fall to the floor and possibly lose consciousness just before he was shot in the head. Amanda said she had gone to the bathroom to blow her nose and did not see how Wilder ended up on the floor or the actual shooting because Schroeder had pushed her around before she heard the gunshot. During his interview with law enforcement, Schroeder corroborated the fact that Amanda had gone to the bathroom at the house. *See Douglas*, 675 N.W.2d at 572 (reaffirming "the testimony of an accomplice and the confession of a defendant constitute acceptable corroboration, one for the other"). The State also points out that the blood spatter and gunshot residue evidence corroborates Amanda's testimony that Schroeder shot Wilder while standing with Wilder already lying prone on the floor. And the expert's testimony that the gun was fired from a distance of three to six feet is corroborated by the fact that none of Wilder's blood was found on clothing worn by either Schroeder or Amanda. Notwithstanding Amanda's consumption of alcohol and some inconsistencies in her story, we conclude there is corroborating evidence to support Amanda's testimony.

Separate from his complaint about counsel's failure to assert Amanda was an accomplice, Schroeder contends counsel should have sought an instruction to the jury about the need to corroborate Amanda's testimony. But we conclude Schroeder has failed to establish a reasonable probability exists that, had his attorney requested a corroboration instruction, the outcome of the trial would have been different. Given the evidence presented, it is more than likely the jury would

have found adequate corroboration. *See State v. Barnes*, 791 N.W.2d 817, 825 (Iowa 2010) (concluding the "defendant has failed to establish that, had the jury been given an instruction on accomplice corroboration, there was a reasonable probability the jury would have come to a different conclusion regarding the defendant's guilt").

*B. Motion to redact portions of Schroeder's interview with law enforcement.* Schroeder next asserts the trial court erred in failing to redact several statements from his interview with Detectives Jansen and Peterson. On appeal, Schroeder claims the objected to portions of his interview

> amounted to inadmissible hearsay and, if minimally relevant for a non-hearsay purpose, the probative value of the statements was substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury under Rule 5.403. Additionally, because the statements were testimonial, their admission at trial violated [Schroeder's] constitutional rights under the confrontation clause. Lastly, if the Court determines these issues were not properly preserved, trial counsel was ineffective.

First, Schroeder argues the challenged statements were impermissible hearsay and constituted improper opinion on witness credibility. He states, "The video contains several portions where the officers hammer [Schroeder] on his story, his credibility, and how his version is completely inconsistent with more believable, unbiased witnesses." We are not persuaded by Schroeder's assertion that the officers' questioning of Schroeder is comparable to the improper "questioning of a witness on whether another witness is telling the truth."[10] We view the questions and statements by law enforcement officers during the interview

---

[10] Quoting *Bowman v. State*, 710 N.W.2d 200, 204 (Iowa 2006).

as not constituting evidence, as the jury was instructed.[11]  *See State v. Enderle*, 745 N.W.2d 438, 443 (Iowa 2007) (noting similar claims have been rejected "primarily on the basis that statements by police officers during interrogations are not 'testimony' given by witnesses at trial and were not offered at trial to impeach the defendant, but to provide context for his responses").

As for Schroeder's claims of hearsay, the State observes the detectives "told Schroeder they had already spoken with [O'Neill], Amanda, [Guzman], [Mendez], and [Duncan] but did not at any time during the interview relate specific hearsay statements of these witnesses about any of the relevant events or times." "Hearsay 'is a statement, other than one made by the declarant while testifying at . . . trial, . . . offered in evidence to prove the truth of the matter asserted." *State v. Newell*, 710 N.W.2d 6, 18 (Iowa 2006) (quoting Iowa R. Evid. 5.801(c)).  As noted in *State v. Dullard*, 668 N.W.2d 585, 589-90 (Iowa 2003), "a declaration is excluded

---

[11] The jury was instructed:

As you have heard, there is a transcript of the recording you are about to hear.  That transcript also undertakes to identify the speakers engaged in the conversation.  The transcript is for the limited purpose of helping you follow the conversation as you listen to the recording, and also to help you keep track of the speakers.  Differences in meaning between what you hear in the recording and read in the transcript may be caused by such things as the inflection in a speaker's voice.  It is what you hear, however, and not what you read, that is the evidence.

Whether the transcript correctly or incorrectly reflects the conversation or the identity of the speakers is entirely for you to decide based upon what you hear on the recording and what you have heard here about the preparation of the transcript, and upon your own examination of the transcript in relation to what you hear on the recording.  If you decide that the transcript is in any respect incorrect or unreliable, you should disregard it to that extent.

Statements and questions by law enforcement officers during the interview with the Defendant are not evidence to be considered for their truth.  The Defendant's answers and responses to those questions and statements are evidence.

from the definition of hearsay when it is not a statement or is not offered to prove the truth of the matter asserted."

The district court rejected Schroeder's hearsay objections noting many statements to which he specifically objected were admissions by the defendant and, thus, not hearsay. *See* Iowa R. Evid. 5.801(d)(2). The district court reasoned that statements made by Amanda were admissible as those of an uncharged co-conspirator "especially as it relates to the firearms and/or the weapon." *See id.* 5.801(d)(2)(E). The court also found statements made by O'Neill were admissible as statements against interest. *See id.* 5.804(b)(3).

On appeal, Schroeder also complains about "several statements" and "objectionable statements of the detectives" without specification. We cannot address such vague claims.

Schroeder now asserts,

As far as the detectives spoke about witnesses they talked with that did not testify at trial, trial counsel was unable to cross examine any of these alleged witnesses and none of these statements would have been admissible if the officers had merely tried to testify to them on the stand.

He maintains his confrontation rights were violated. This claim was not made in the district court and, consequently, is not properly preserved for review. *See State v. Gaskins*, 866 N.W.2d 1, 6 (Iowa 2015). Schroeder also urges that if error was not preserved we consider the issue under the guise of ineffective assistance of counsel. But, we reiterate the jury was instructed the officers' statements and questions were not evidence, and we have no reason to believe the jury did not follow the instruction. *See State v. Gomez Garcia*, 904 N.W.2d 172, 183 (Iowa 2017) ("We presume jurors follow the court's limiting instructions."). Thus, we find

no testimonial statements and no violation of the confrontation clause. *Crawford v. Washington*, 541 U.S. 36, 52-53, 60 (2004) (noting the Confrontational Clause relates to testimonial statements).

*C. Habitual-offender stipulation.* Last, Schroeder contends his habitual-offender stipulation was not knowing and voluntary. He notes the district court failed to advise him the habitual-offender enhancement would increase the penalties for the charges of being a felon in possession of a firearm and going armed with intent from five to fifteen years. He also maintains the court failed to inform him of the minimum and maximum punishments under the enhancement, including the three-year mandatory minimum before parole eligibility.

In *State v. Harrington*, 893 N.W.2d 36, 45-46 (Iowa 2017), our supreme court "clarified the scope of the stipulation colloquy, as it applies to prior-conviction stipulations for habitual-offender enhancement purposes." *State v. Brewster*, 907 N.W.2d 489, 493 (Iowa 2018). In *Harrington*, the court stated:

> Generally, the voluntary-and-intelligent standard for admitting to prior convictions in a habitual offender proceeding should follow the same protocol [as accepting a guilty plea]. First, the court must inform the offender of the nature of the habitual offender charge and, if admitted, that it will result in sentencing as a habitual offender for having "twice before been convicted of a felony." *See* Iowa Code § 902.8. The court must inform the offender that these prior felony convictions are only valid if obtained when the offender was represented by counsel or knowingly and voluntarily waived the right to counsel. *See* Iowa R. Crim. P. 2.19(9). As a part of this process, the court must also make sure a factual basis exists to support the admission to the prior convictions. *See* Iowa R. Crim. P. 2.8(2)(b).
> Second, the court must inform the offender of the maximum possible punishment of the habitual offender enhancement, including mandatory minimum punishment. *Id.* In the typical case, the court must ensure the offender understands he or she will be sentenced to a maximum sentence of fifteen years and that he or she must serve three years of the sentence before being eligible for parole. *See* Iowa Code §§ 902.8, .9(1)(c). If the offender faces a greater

mandatory minimum punishment or maximum possible punishment due to the present offense charged, the court must inform the offender of the specific sentence he or she will face by admitting the prior offenses. *See In re Yurko*, 519 P.2d [561,] 565 [(Cal. 1974)] (noting an offender must be informed "of the precise increase in the term or terms which might be imposed"); *State v. Ross*, 729 N.W.2d 806, 812 (Iowa 2007) ("[T]he mandatory minimum sentences prescribed in section 902.12 apply to habitual offenders.").

Third, the court must inform the offender of the trial rights enumerated in Iowa Rule of Criminal Procedure 2.8(2)(b)(4). For the reasons discussed below, the right to a jury in the second trial only pertains to the issue of identity. Any claim by the offender that he or she was not represented by counsel and did not waive counsel in the prior convictions is heard and decided by the district court. Although the offender has no right to a jury trial on these issues, the other rights associated with a trial are applicable at the hearing before the court.

Fourth, the court must inform the offender that no trial will take place by admitting to the prior convictions. The court must also inform the offender that the state is not required to prove the prior convictions were entered with counsel if the offender does not first raise the claim.

Finally, we reiterate that the district court must inform the offender that challenges to an admission based on defects in the habitual offender proceedings must be raised in a motion in arrest of judgment. The district court must further instruct that the failure to do so will preclude the right to assert them on appeal. *See* Iowa R. Crim. P. 2.8(2)(d).

893 N.W.2d at 45-46. Because Harrington was not informed of his constitutional rights and the consequence of his admission of habitual-offender status, the supreme court concluded he did not knowingly and voluntarily admit his prior convictions. *Id.* at 47. The supreme court reversed the judgment and sentence of the district court, and remanded the case to the district court for further proceedings consistent with its opinion "or, if Harrington denies the prior convictions or their validity, for trial on whether he meets the requirements of a habitual offender as defined in Iowa Code section 902.8." *Id.* at 48.

First, we note the convictions for going armed with intent and for being a felon in possession of a firearm are supported by substantial evidence. We also agree the district court did not fully comply with the dictates of *Harrington*. But we also note the requirement to file a motion in arrest of judgment to challenge the deficiencies of a habitual-offender proceeding was only applied prospectively. *Id.* at 43. The *Harrington* decision was filed June 14, 2017, and the trial in this action began on July 12, 2016. Thus, at the time of Schroeder's habitual-offender proceeding, he was not required to file a motion in arrest of judgment to preserve error and is entitled to challenge the deficiencies in this appeal. *Id.*

The State argues this issue is "academic" in light of Schroeder's LWOP sentence. However, there is a possibility a LWOP sentence could be commuted by the governor or the conviction overturned notwithstanding our decision. *See generally Lowery v. State*, 822 N.W.2d 739 (Iowa 2012). If either circumstance arose, the other sentences including the habitual-offender enhancement may have some significant consequence. Accordingly, we reverse in part the judgment and sentences of the district court. More specifically, we reverse the habitual-offender sentencing enhancement and the sentences for going armed with intent and for being a felon in possession of a firearm. We remand this matter to the district court to conduct a hearing, or if necessary a trial, on the prior convictions pursuant to Iowa Rule of Criminal Procedure 2.19(9) and *Harrington*. *See State v. Allie*, No. 17-0190, 2018 WL 739297, at *5 (Iowa Ct. App. Feb. 7, 2018) ("In the absence of a substantially compliant colloquy, it cannot be said the defendant's stipulation of the prior convictions was knowing and voluntary."). Upon resolution of the habitual-offender enhancement, Schroeder shall be re-sentenced for the offenses

of going armed with intent and being a felon in possession of a firearm, with or without the enhancement as determined by the district court.

**AFFIRMED IN PART, REVERSED AND REMANDED IN PART.**